MORTON et al. v. CALVIN.

(Court of Civil Appeals of Texas. Texarkana. Feb. 26, 1914. Rehearing Denied March 5, 1914.)

1. WILLS (§ 487*)—EVIDENCE TO AID CONSTRUCTION—MISTAKE BY TESTATOR.

A testator, who by his will disposed of the estate of his deceased wife as well as his own, and who owned four tracts of 17, 15, 41, and 284 acres, respectively, in the S. survey, gave to his daughter E. the 325 acres of land owned in such survey and purchased in one block from F. and gave to two other daughters 17 acres owned in such survey, and also 15 acres in that survey. The deed from F. to his deceased wife conveyed land described as 325 acres, and by metes and bounds, embracing the 41 and the 284 acre tracts, but the testator claimed to own the 41-acre tract prior to such deed, and regarded it as a part of his homestead or home place. He told the lawyer who drew the will that he wanted the two daughters mentioned to have the home place, and that he wanted E. to have the land bought from F., but said nothing about the number of acres in the tract bought from F., and the attorney, in stating the number of acres, followed the recital in the deed. Held that, assuming that parol testimony of these facts showed that the testator intended to give the 41-acre tract to the two daughters, such intention could not be given effect, as the will itself contained an ambiguity, and the courts cannot grant relief against a mistake by the testator not apparent on the face of the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1023, 1026–1032; Dec. Dig. § 487.*]

2. HUSBAND AND WIFE (§ 193*)—WIFE'S SEPARATE ESTATE—MODE OF ALIENATION.

That a married woman did not know that a devise to her included a particular tract, and that she treated her two sisters as the owners thereof, did not transfer the title to them, in view of Rev. St. 1911, art. 1114, providing that the husband and wife shall join in the conveyance of the wife's separate property and for the due acknowledgment of the deed.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 716–718, 940; Dec. Dig. § 193.*]

3. HUSBAND AND WIFE (§ 244*)—ACTIONS—COSTS.

Where, in trespass to try title by a married woman's grantee, he demanded judgment against her and her husband on the warranty of title in the event of a determination that a third person owned the land, and in their answer the husband and wife offered to rescind the sale, and judgment was rendered awarding the title and possession to plaintiff, the judgment properly awarded costs to plaintiff against the husband and wife, though he did not recover on the warranty, since they were in effect plaintiffs in a suit against the grantee to rescind the sale, in which suit they failed.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 875–877, 988; Dec. Dig. § 244.*]

Appeal from District Court, Gregg County; W. C. Buford, Judge.

Trespass to try title by Grover C. Calvin against Mattie Morton and others. Judgment for plaintiff, and defendants appeal. Affirmed.

William Morton died in May, 1906, and left surviving him a son, S. T. Morton, and four daughters, Mattie Morton, Annie Morton, who afterwards married Clark Dickson, Mrs. Ellen Reynolds, wife of J. D. Reynolds, and Mrs. Lela Compton, wife of W. E. Compton. At the time, and for many years prior to the time he died, William Morton resided on a tract of land owned by him, known as the Baggett survey. Adjoining said tract of land on the east were the Wm. McCurry and Nathan Screws surveys; the latter being situated north of the former, and the west boundary line of each being identical with the east boundary line of said Baggett survey. William Morton owned the McCurry survey. He also owned tracts of about 17, 15, 41, and 284 acres, respectively, on the Screws survey, perhaps all of said survey, except a portion thereof known as the "Angell tract," situated in the southwest part thereof. The 17-acre tract referred to was in the extreme southeast corner of the survey. The 15-acre tract was a strip 33 varas wide off the west end of the Screws survey and extending 2,070 varas north and south along the east line of said Baggett survey. The 41-acre tract was 233 varas east and west and 1,010 varas north and south, and lay between the Angell tract on the east and said 15-acre tract on the west. The 284-acre tract was situated west of and adjoining the 15-acre tract north of and adjoining the 41-acre and the Angell tracts.

William Morton left a will, in which he devised the lands mentioned and other tracts, some of which belonged to him and others to the estate of his deceased wife, which he disposed of, as if his own, to their children. The devise to his daughter Mrs. Ellen Reynolds was in the words following: "I give to my daughter Ellen Reynolds the 325 acres of land that I own on the Nathan Screws headright survey that I purchased in one block from Geo. Foster; also 200 acres of land off of the east end of the 320-acre tract I own on the J. G. Walker survey that I purchased from Martin Casey; also 30 acres off the John Keiser survey, beginning," etc. The devise to his daughters Mattie and Annie was as follows: "I give to my daughters Mattie Morton and Annie Morton, share and share alike, in equal portions, the 320 acres of land I own on the Silas Baggett survey; also all that part of the land I own on the Wm. Hester survey, except that part that I have bequeathed to my son S. T. Morton in section fourth of this will, the part of said survey herein given to the said Mattie and Annie Morton being about 255 acres; also all the land I own on the Wm. McCurry survey, being 320 acres; also all the land I own on the W. J. McCurry survey, being 67 acres; 17 acres that I own on the Nathan Screws survey that I purchased at tax sale; also 15 acres of land that I own on the Nathan Screws survey that I purchased from Geo. Foster, which is west of the 325 acres given to my daughter Ellen Reynolds in section second of this will; also 95 acres of land on the John Keiser survey to which I have tax title; also the 15½ acres of land I own on the James Hilliard survey, which I purchased from Miss Eliza Barber."

Within a few days after the death of William Morton, his children, the devisees named in the will, agreed, each with the others, that the bequest to each should be confirmed by deeds from the others. The agreement was consummated by deeds dated June 4, 1906. The deed to Mrs. Ellen Reynolds was made by Mattie, Annie, and S. T. Morton and Mrs. Compton, joined by her husband, and it purported to convey to Mrs. Reynolds the land devised to her in the will, to wit, the 325 acres of the Screws survey, describing same by metes and bounds, within which were included as one tract the 41-acre and the 284-acre tracts referred to above.

Notwithstanding the 41-acre tract on the Screws survey was not mentioned in the will as a part of the lands thereby devised to Mattie and Annie Morton, all the parties concerned assumed it had passed to them by the terms of the will, and notwithstanding the deed to Mrs. Reynolds, whereby all the other devisees in the will conveyed to her 325 acres of the Screws survey by a description which included said 41-acre tract, Mattie and Annie thereafterwards assumed to own, and the other devisees recognized and treated them as the owners of, said 41 acres.

After the marriage of Annie Morton to Clark Dickson, she and her sister Mattie partitioned between them the lands devised to them jointly, treating the 41 acres as a part of those lands. In the partition the 41 acres was allotted to Mattie Morton, and thereafterwards she claimed to own same. The other devisees acquiesced in her claim, treating her as the sole owner of said 41 acres, except so far as the act of Mrs. Reynolds and her husband, now to be mentioned, may have appeared to the contrary.

Said Mrs. Reynolds and her husband by their deed dated March 22, 1911, in consideration of $2,275 paid and to be paid to them by Grover C. Calvin, conveyed to said Calvin the 325 acres of the Screws survey conveyed to them by the other devisees named in the will, describing same by metes and bounds, which, as was the case in the deed to them, included said 41 acres.

By the terms of a contract between J. D. Reynolds, representing his wife, and J. O. Calvin, representing his son said Grover C. Calvin, possession of the 325 acres was not to be delivered to said Grover C. Calvin until December 1, 1911. He then, or afterwards, obtained possession of all the 325 acres except the 41-acre tract, which Mattie Morton claimed to own. She refused to yield possession of said 41 acres, asserting, as she had since the partition between herself and her sister Annie was made, that she was the owner thereof. Thereupon said Grover C. Calvin commenced and prosecuted to the judgment appealed from a suit of trespass to try title against her. He made Mrs. Reynolds and her husband parties defendant to the suit, asking judgment against them on their warranty of the title to the land, in the event it was determined that Mattie Morton owned it. In her answer Mattie Morton pleaded "not guilty," set up the statute of limitations of ten years, and suggested that she had in good faith made improvements on the land. In their answer Reynolds and his wife denied the allegations in the petition, averred that the land in controversy passed to Mattie and Annie Morton by the terms of the will; that the conveyance of same by them to Ellen Reynolds was the result of a mutual mistake; that until Annie married she and Mattie were in possession of the land, and that Mattie thereafterwards, as the sole owner thereof, was in possession of same; that Calvin knew she was in possession of same, and knew that they had not agreed to sell same to him, but had only agreed to sell him the 284-acre tract; and that, in so far as their deed purported to convey the 41 acres to Calvin, it was the result of a mutual mistake. In their answer Reynolds and his wife also offered to rescind the sale made by them to Calvin.

The trial was to the court without a jury. The court found the facts to be as follows, quoting: "(1) That the Morton will devised the 41⅛ acres of land in suit to Ellen Reynolds, which was included in the 325 acres given her by the will. (2) That all of the legatees accepted the terms of the will and received the land given to them by the will; and that they afterwards, by partition deeds, conveyed to each other, by metes and bounds, the land which had been given to them in the will. (3) That the defendant Mattie Morton was in possession of the land in suit since the death of William Morton, cultivating, using, and enjoying it;" but "that she had no title to the same by deed, devise, or limitation, and therefore has no title of any kind to the said land. (4) That by the conveyance" from the Reynolds "to the plaintiff in the suit, the plaintiff has title to the land and is entitled to recover possession of the same. (5) That at the time of plaintiff's purchase of the land he had actual knowledge, through his agent, his father J. O. Calvin, that Mattie Morton was in possession of the land, but that he relied upon the description of record title; and, if he had not, the prosecution of an inquiry as to how she held would have informed him that she had no title, either legal or equitable."

On the findings set out above, and others as to the rental value of the land for the year 1912, and as to the value of certain timber cut therefrom, the court rendered a judgment in favor of Calvin against said Mattie Morton, J. D. Reynolds, and Ellen Reynolds, the appellants here, for the title to and possession of the 41 acres of land, against said Mattie Morton alone for the sum of $64 as damages, and against her and the other appellants for the costs of the suit. In so far as appellee Calvin sought a recovery against the Reynolds on their warranty of the title to the land, the judgment was that he take nothing.

Young & Stinchcomb, of Longview, for appellants. McCord & Campbell, of Longview, for appellee.

WILLSON, C. J. (after stating the facts as above). [1] The objections urged to the judgment in the brief filed by appellant Miss Mattie Morton are not the same as those urged to it in the brief filed by appellants Mrs. Ellen Reynolds and her husband. We will first consider questions made by assignments in the brief of Miss Morton, and in doing so will refer to her as "appellant."

Appellant insists the court erred in finding that William Morton devised the land in controversy to Ellen Reynolds, "because," she says, quoting from the brief, "the undisputed evidence shows that it was the intention of the said William Morton to not give the said land to Ellen Reynolds, but to give it to Mattie Morton and Annie Morton."

If the evidence appellant refers to is that furnished by the language used by the testator in his will, clearly she has misconstrued the meaning of that language, for it not only does not show the intention of the testator to have been to give the land to her and her sister Annie, but, on the contrary, shows his intention to have been to give it to Ellen Reynolds. The testator owned on the Nathan Screws survey only the tracts of 17, 15, 41, and 284 acres, respectively, referred to in the statement above. In plain language he gave to appellant and her sister Annie the 17 and 15 acre tracts, and in as plain language he gave to Ellen Reynolds 325 acres, or the sum of the other two tracts.

If the evidence referred to in the assignment is the parol testimony heard on the trial, then, to determine whether the contention should be sustained or not, it is necessary to look to the record to see what that testimony was, and then to inquire whether it was testimony the court was authorized to consider for the purpose of determining the intention of the testator.

It was shown that the testator claimed he had acquired title to the 41 acres from one Berry, and that he had had possession of it, cultivating and using it as his own during the 35 or 40 years immediately preceding his death. It was also shown that he regarded it as a part of his homestead or "home place." A few days before his death he had the witness Ras Young, a lawyer, to come to his home, where he was sick, for the purpose of preparing the will in question. He then stated to Young, as he had previously to other persons who testified, that he wished appellant and her sister Annie "to have the home place, so that they would not be interfered with at all in their occupancy or use of that." He further stated to said Young that he wished to give to his daughter Ellen Reynolds the land "he brought from Geo. Foster that lay north of the home place." Young did not remember whether the testator, at the time he expressed his wish with reference to the devise to said Ellen Reynolds, said anything about the number of acres in the tract he mentioned as one he bought from Geo. Foster or not, but thought he did not, and that in writing the will he (Young), in stating the number of acres in the tract, followed the recital, as to quantity, contained in the deed from Geo. Foster to the testator's deceased wife, which was placed in his hands by members of the testator's family for use by him (Young) in drafting the will. In the deed from Geo. Foster referred to the land thereby conveyed was described as 325 acres of the Nathan Screws survey, and by metes and bounds, which embraced both the 41 acres in controversy and the 284-acre tract hereinbefore referred to.

The testimony recited above and that furnished by the will itself is about all, if not

all, there is in the record which can be said to have a bearing on the question as to the disposition the testator intended to make of the land in controversy. As we have seen, looking to the language of the will alone, the intention of the testator clearly was to give the land to Mrs. Reynolds, and not to appellant and her sister Annie. Assuming that the other testimony recited established his intention to be to the contrary (that is, to be to give the land to appellant and her said sister, instead of to Mrs. Reynolds), then the question to be determined is this: Should the court have given effect to the intention of the testator evidenced by the language used by him in the will, or should it have given effect to his intention as shown by the parol testimony heard?

In the light of the authorities, we think the only answer to be made to the question is that the court was bound to give effect to the intention of the testator evidenced by the language used in the will. The rule has been thus stated: "That parol evidence is not admissible to add to, vary, or contradict the words of a written will, not only because the will itself is the best evidence of the testator's intention, but also because wills are required by the statute of frauds to be in writing." 30 A. & E. Enc. of Law, p. 673. Discussing the rule and the qualifications to which it is subject, the author of the article in the work cited says: "Where the will contains a latent ambiguity, or its language is uncertain or indefinite, it is a firmly established rule that parol evidence is admissible to show the facts and circumstances that surrounded the testator at the time of the execution of the will, such as the condition and situation of his property and family, so that the court may be placed as nearly as possible in his position, and thus arrive at his intention; but, when the words of the will are plain and unambiguous, such evidence is inadmissible. Although collateral aids, such as a view of the situation and circumstances surrounding the testator, are often necessary to enable a court to see things as he saw them, and to apply his language as he understood and intended it, yet the will must speak for itself, and the intention of the testator must be gathered from what appears on its face. To allow the natural import of the words thus ascertained to be varied or contradicted, or omissions supplied, or apparent ambiguities removed, or intention supplied by parol evidence, would be to repeal the law requiring a will to be in writing and to introduce all the uncertainty, fraud, and perjury the statutes were designed to prevent." 30 A. & E. Enc. of Law, pp. 676 to 678; 2 Underhill on Wills, § 908 et seq.; Hunt v. White, 24 Tex. 643; Peet v. Ry. Co., 70 Tex. 527, 8 S. W. 203.

The case-made clearly is not one of a latent ambiguity appearing in the will, when considered with reference to the property devised. The bequest to appellant and her sister Annie of land on the Nathan Screws survey was, as has been stated, of the 17 and 15 acre tracts alone. The bequest to Mrs. Reynolds was of the 325 acres on that survey "purchased in one block from Geo. Foster." It appeared that the testator, or his deceased wife, whose estate he was disposing of with his own, had purchased of Geo. Foster "in one block" 325 acres of the Screws survey. It may be that at the time this purchase was made the testator owned 41 acres (the land in controversy) of the 325 acres, but we think the fact that he did was of no importance, for nevertheless, as shown by the deed from Foster, he, or his said wife, purchased same as a part of the 325 acres, and "in one block." So, it appearing that the 325 acres, the only land owned by the testator or his wife on the Screws survey not otherwise disposed of by the will, answered in all respects the description of the tract devised by the will to Mrs. Reynolds.

The case-made, instead of presenting a latent ambiguity in the will which could be explained by a resort to the parol testimony, presented one in which it may have appeared from the parol testimony that the testator, as the result of a mistake, devised the land in controversy to his daughter Ellen, when he intended to devise same to appellant and her sister Annie. It is well settled that, unless the mistake is one apparent on the face of the will, courts are powerless to grant relief against it; and that "omissions in a will, though due to accident or mistake, cannot be supplied by parol proof of intention." 30 A. & E. Enc. Law, p. 680; Underhill on Wills, § 912; Hunt v. White, 24 Tex. 652. In the section cited in Underhill on Wills it is said: "Parol evidence is never receivable to supply single words or clauses where the omission is not apparent on a reading of the will. Thus it cannot be shown by parol that the testator stated that he would give or had given a legacy to a person whose name is not mentioned, or that the draughtsman of the will had forgotten to insert a legacy which the testator meant to give; nor can the amount of a legacy precisely stated be increased or diminished by parol evidence, no matter how clear and convincing such evidence may be. * * * Under the rule that parol evidence cannot be employed to vary or add to a will, it is incompetent to show by the declarations of the testator or other intrinsic evidence that the testator has by his own mistake or that of some other person given a legacy of less value or of a different character from that which he in fact actually meant to give. Thus, where the testator owned land in A. county, and also in B. county, both of which he intended to devise to his wife, but, as was conclusively proved, the description of the land in B. was inadvertently stricken out in copying the will, parol evidence was rejected, though it appeared that the final copy

of the will had never been read to the testator, and that the original draft in his own hand included the property in B. county. In another case $10,000 was directed to be divided equally between A. and B. The draughtsman drew two clauses, in each of which, by his mistake, $10,000 was given to A. The name of B. was wholly omitted from the draft and also from the engrossment, and the will was executed with the mistake uncorrected. The name of A. was stricken out of one of the clauses by the court, as the error was apparent upon the face of the will. But the name of B. could not be inserted on parol evidence to give him a legacy not given by the will."

[2] It thus appearing that the effect of the will was to pass the title to the land in controversy to Mrs. Reynolds, and not to appellant and her sister Annie, it follows that the judgment, so far as it is in favor of Calvin against appellant, must be affirmed. For it is clear that the title so vested in Mrs. Reynolds never passed from her until it was conveyed by her and her husband to Calvin. The mere fact that she did not know that the land had been devised to her, and treated appellant and her sister Annie as the owners thereof, would not operate to transfer the title to them. The title of a married woman to land belonging to her separate estate cannot be passed in that way. Article 1114, R. S. 1911.

[3] The objection and only one urged by appellants Reynolds and his wife to the judgment is that it should not have been against them either for the land or for any of the costs, because Calvin did not sue them for the land, but on their warranty of the title thereto. The argument is that as Calvin recovered the land of appellant Miss Mattie Morton, the only person he sued therefor, he was not entitled to recover and did not on the warranty, and therefore that judgment should have been that he take nothing as against Reynolds and wife, and that they recover costs of him. It is further urged that as to Mrs. Reynolds the judgment against her for costs was unauthorized, if for no other reason, because she was a married woman. In making the contention, said appellants, Reynolds and his wife, seem to have overlooked the fact that the land belonged to Mrs. Reynolds' separate estate, and that in their answer they asked for a rescission of the contract of sale between them and Calvin, praying that the title to same be decreed to be in them. They thus in effect became plaintiffs in a suit against Calvin to rescind the sale made to him and to recover the land. They failed in this suit, and clearly were liable for the costs thereby incurred. Therefore the assignments urged by them are overruled.

There is no error in the judgment, and it is affirmed.